First case on our docket this morning is 23-60494 McRaney v. N Amer Mission Board of the Southern Baptist Convention. Mr. Gantt. Good morning, your honors. May it please the court. Scott Gantt from Blue Cross and Blue Shield for Dr. Will McRaney. The district court has now twice dismissed this case on the purported ground that there is a lack of subject matter jurisdiction, even though the defendant, Nam, has never made that argument below. In McRaney 1, this court reversed, explaining that the quote relevant question was whether resolution of claims will require the court to address purely ecclesiastical questions. That's from page 349 in McRaney 1. The answer that that is still the relevant question today. And the answer to that question is no. In order to adjudicate Dr. McRaney's claims, which are now quite mature, this case was now dismissed a matter of weeks before trial was scheduled. It's clear looking at the record developed at the at the pleading, which is different than the pleading that was before the court in McRaney 1. The current pleading is in the record excerpts beginning at page 35. It was filed in December of 2022 entitled a supplemental pleading. It's clear that the answer to the relevant question is no. For none of the six causes of action asserted in the operative pleading, will the court be required to address purely ecclesiastical questions? And it's certainly the answer is no with respect to each of the six. The district court in its order failed to address the claims one by one as is required and did not address the allegations in any detail. As I noted a moment ago, this case was dismissed the second time a matter of weeks before trial. It was overseen almost entirely in the district court before Magistrate Judge Sanders. The district court judge dismissed after the after fact discovery had concluded, including discovery from BCMD, Dr. McRaney's former employer. During discovery, there were no motions for protective order filed by NAM, nor did NAM file any motions in limine on First Amendment grounds. Fact discovery was concluded. Expert discovery was concluded. Dr. McRaney submitted an expert report from a historian from Baylor named Dr. Hankins, who's mentioned extensively in the briefing and also an economist who estimated actual damages. Summary judgment briefing, as you know, was concluded and motion in limine briefing had been initiated. NAM filed three motions in limine, again, none of them on First Amendment grounds. We responded to those and then the case was dismissed, I believe, two days before the reply brief. Some motions in limine were to be concluded. And the parties also submitted their proposed final pretrial order to Judge Sanders electronically so it's not in the record. But notably in that pretrial submission, NAM's portion told the court that this was a, quote, relatively straightforward trial. And I agree that it was. This was an explanation of why only approximately one week was needed for trial. So if we look at the actual allegations, we look at the course of discovery, we can see what the court couldn't see in McRaney 1, which is that there are no purely ecclesiastical questions to be decided. In fact, I contend that there are no ecclesiastical questions to be decided at all, purely or not. But surely not strictly and purely, which is the language that I think originated in Watson and then made its way into this court's decision in McRaney 1. This is not an ecclesiastical dispute, nor is it an internal church dispute or a ministry dispute. Judge Oldham, I'm sure you've looked back at the opinion that you wrote descending from the denial of her hearing in McRaney 1, which is quite an interesting read. I don't pretend to know what was in your mind when you wrote it, but I think it's possible that you were misled by the erroneous amicus brief that had been submitted to the court by a co-agency of NAM called the ERLC. The ERLC submitted a brief to the court that made material misrepresentations to this court about the nature of baptist polity. Those misrepresentations were conceded after the denial of rehearing, four months after rehearing was denied. And as we pointed out in our briefing, we also informed the Supreme Court when NAM petitioned for certiorari. These material misrepresentations were before the court at the time that the court decided rehearing. And again, I don't pretend to speak for Judge Oldham or Judge Ho or any of the other judges who dissented, but some of the statements in there about the nature of the case and the nature of baptist polity were clearly wrong. They have been corrected, we hope, based on the undisputed factual record. We could look at the undisputed opinion of Dr. Hankins. I think even the NAM witnesses conceded that the brief was wrong in material respects. We have citations to the record, those in our briefs. And when we look at that, we see that this is not an internal dispute. Also, it's telling, I think, that the only amicus brief that was submitted by baptist leaders in this case, who were not parties to the case, support Dr. McCraney. That's the Michelle Stratton brief, the amicus brief from current and past baptist leaders, including notably someone named Morris Chapman. If you look at that brief and you look at the biography of each of the leaders, he was and is a longtime, very senior leader of the Southern Baptist Convention, which is the parent of NAM. NAM is an agency of the SBC. And even he and the other leaders recognize that this is not an internal church dispute. Mr. Gant, can you help me? I understand your point about the previous amicus brief, and I hear you. The thing I'm not sure I understand is why it matters. The Beckett Fund files an amicus brief and they say, like, okay, there's no Baptist church, just Baptist churches. Well, the same could be true about the Muslim faith. The same could be true about the Jewish faith. At the end of the day, it's an ecclesiastical dispute, regardless of the nature of the baptist polity. What's your response to that? I think there are several questions of whether it's an ecclesiastical dispute and whether it's an internal dispute. The reason why it matters whether it's internal is that under current, I submit, Supreme Court and Fifth Circuit law, the parameters of the doctrines are framed in a way where whether the dispute is internal makes an enormous difference. If we look at the ministerial exception cases, although the language of internal precedes those cases, and, again, there's this nomenclature issue, I think you frame this as religious autonomy in your opinion. I actually agree that emphasis on autonomy matters, and this goes to the question of internal, because autonomy is, again, looked it up, the definition last night, it's self-governance. The doctrine is designed, and I view the ministerial exception as a subset of the broader doctrine. You may or may not agree, but that's how I look at it. The doctrine is set up so it's protecting some of the activities within a religious institution. Of course, church, I think, is not limited to Christianity. It's meant more broadly. It could be a different kind of religious institution. But the doctrine is limited, certainly the ministerial exception is, to internal decision-making, and that's for a good reason, which is because if you have to, the doctrines depend on making judgments about the relationship between two separate religious organizations that are not part of the same entity. Then you run into what Justice Alito described in Our Lady of Guadalupe, where he rejected having the doctrine turn on judgments about whether people are co-religionists, which I think is what NAM is essentially arguing here. They say, yes, we recognize the principle of autonomy. It's central to Baptist polity, but we're co-religionists, so you should treat this as an internal dispute. And I think that that's wrong, and I think that Our Lady of Guadalupe suggests that's wrong because Justice Alito's point for the court in Our Lady of Guadalupe, when he was addressing arguments that are based on identifying co-religionists, he said that entangles us in religion in a way that we should not be involved, figuring out whether people are co-religionists. You mentioned some other religions. I think he asked the question, are Orthodox Jews and Reform Jews, are they co-religionists? Yeah, but one of the principles that comes out of all of that is that we don't want secular courts making judgment calls about sectarian disputes, and it doesn't really have anything to do with the nature of the polity that's involved, or whether it's interior. As you point out, and I'm not sure if it's right, I'm not sure if it's wrong, but let's just take it because it's your point, which is that the ministerial exception perhaps is a subset of a broader ecclesiastical autonomy doctrine. If that's true, then the broader doctrine is not just about interior disputes within a given religious organization about who's going to be the minister. It includes other things. And so one hypothetical that I'm curious to get your reaction to is imagine that they're in the Jewish faith, that there's a contract for the provision of kosher meat, and the allegation of the breach of the contract is, well, I have it on good faith authority that you did not butcher this particular animal, this group of animals, in a kosher way. Is your position that we are then going to have secular courts making judgment calls about, well, let's talk about the particular circumstances in this particular butchering of this particular animal, and we're going to have sort of expert reports about this is what it means to be kosher meat and this is how this animal was executed? That just strikes me that that is the kind of entanglement this doctrine is supposed to prevent. So I think the case law on the broader doctrine and certainly on the ministerial exception, just based on the way they've developed, a lot turns on whether it's internal, about the degree to which the courts are going to reflexively remain in or out of the dispute. But I would agree with you that there can be a non-ministerial exception case where the doctrine could apply, if it's clear that it will require the court to resolve a purely and strictly ecclesiastical dispute. Now, I'm not sure that it would in your hypothetical, and I can come up with hypotheticals where it clearly wouldn't. I mean, let's take another Jewish example. You may be familiar, I mean, it may not be limited to the Jewish tradition, but male circumcision at eight days after birth, and that's often performed in the religious ceremony. It's performed by someone called a mohel. And let's say the mohel comes in and is drunk and maims the young boy's genitals, and the family wants to sue. This dispute arose out of a religious ceremony, and yet I would contend that if they want to bring a claim for a tort, that is not requiring the court to engage, decide, or resolve or get embroiled in a religious dispute. And, of course, we can come up with hypotheticals that are all across the range. I guess the reason I'm pressing it is not because you can't show in a given set of facts that it does or doesn't apply. I mean, that's true about whether it's jurisdictional or it's an affirmative defense or whatever you want to think of the label that's going to go on it. It may or may not apply. My only point is that it certainly could apply outside of purely employment relationships, pure polities that look more like the Catholic Church perhaps than the Baptist Church. I agree. There are facts where it could, but here, importantly, and I see I'm quickly running out of time, is on these facts I think it's now clear, given where we are, that the resolution of Dr. McCraney's six claims will not require the court to resolve purely ecclesiastical disputes. I don't think for any of the six. I think the arguments for four through six, which are the post-termination claims, are even weaker. So we would submit that none of them are required, but what the district court didn't do and what courts are supposed to do generally with respect to jurisdiction and otherwise is to actually go claim by claim and allegation by allegation, like with respect to freedom of speech. You can't come in and say, oh, this is a speech issue. The courts have to bow out. We've developed doctrine. The courts have developed doctrines over hundreds of years to figure out when that's a defense or when they can adjudicate it and when they can't. This needs to be a chisel and not a sledgehammer, and what the district court did was use a sledgehammer, misunderstanding the facts, misunderstanding the allegations, and misunderstanding the law, and resulted in a decision, as we submit, that is wrong in almost every material respect, most of which we haven't covered yet, but we'll rest on our briefs if we don't have time to address. Well, I certainly will intervene on your behalf and ask the chief for additional time if there's points that you'd like to make. I'm sorry for the number of questions that I have, but I do have one more, and it's about the termination claim. So I'm looking at the SPA, which I gather is the beginning, perhaps the font, perhaps the central document in at least the way that the termination happens, and this looks to me like a sectarian document from the beginning to the end. This is not the kind of commercial dispute that perhaps Bush-Shiller normally handles where we're going to provide a certain number of widgets at a certain rate over a certain period and you fail to deliver or whatever. I mean, I don't understand how, as to this particular claim, any claim actually surrounding the SPA, we're going to ask a secular court to have expert reports about what it means to help each convention penetrate lostness. For example, these are important sectarian goals, but I'm mystified by how one would have a breach claim on a provision agreement for penetrating lostness. If that were the claim and that were the relevant issue, I would agree with you. Again, I think we shouldn't look at the SPA as a monolith. If what was at issue were the provisions about what lostness means or whether it exists or doesn't exist or was being remedied or not, I would agree that certainly starts to look like it's an ecclesiastical question. But the SPA is only relevant here, and this is why it's so important to ground this in the actual allegations and the actual facts. The relevant provision of the SPA was the assertion that there was a breach, and we detail this in our reply brief, so I'm sure you've read it, but I'll refer you back to it again. NAM's central allegation of breach was that Dr. McCraney failed to consult with NAM in the hiring of personnel that were jointly funded. That aspect of the SPA does not enmesh the court, and that is not an ecclesiastical dispute. Just like I think in your dissenting opinion on rehearing, you made the observation, and I'm not saying you've committed yourself to any position, that maybe defamation is now and perhaps for a long time an inherently secular claim. So you need to look at what the actual allegations are. What Dr. McCraney is complaining about is not the provisions of the SPA that you cited. He's saying that it would be similar to as if the allegation here was NAM said falsely that he had stolen money that was used for joint funding of the positions under the SPA, and in fact it turned out it wasn't true, and NAM went around and told BCMD that he had stolen when that was false, and told the world that he had stolen, and then told him, as we allege actually occurred here, well it's undisputed, that NAM called him a liar, that he was delusional. He was the only person whose photo was ever put up at NAM, and it was put up for the purposes of non-entry, which made the world understand that he was a persona non grata. So we need to look, and so I agree with you that if some of those portions of the SPA that have the language that you're referring to were what was at issue, then it might start to look like the court would need to decide an ecclesiastical question, but neither the fact finder nor the judge here will have to decide any of those things. They have to decide whether or not it's true that Dr., and I see my time's up if I could finish my question. Whether it's true that Dr. McCraney failed to consult as required, and we put in evidence in our reply brief that they're actually wrong about that, that he did actually consult. But to the core of your question, it doesn't require the court to resolve an ecclesiastical matter. I'm happy to sit down. I've reserved some time for rebuttal. Thank you. May it please the court. Matthew Martins for the Appellee Defendant, North American Mission Board of the Southern Baptist Convention. This dispute is fundamentally a ministry dispute. Will McCraney, a Christian minister and leader of a religious organization, is asking a civil court to adjudicate how two cooperating Baptist organizations interacted concerning his work as it related to those organizations' joint ministry. That's fundamentally the dispute here, and respectfully, civil courts have no say in a dispute of that sort. There's at least two constitutional doctrines that compel that result, ecclesiastical abstention and ministerial exception. But before turning to those doctrines, I'd like to first highlight two data points that I think are relevant to both of those doctrines. The first data point is this. As demonstrated through the factual record developed on remand, Baptists interact through voluntary cooperative relationships or associations between autonomous entities rather than through hierarchies. So, for example, hundreds of Baptist churches in Maryland partner together with each other to form BCMD. They do that voluntarily while maintaining their autonomy. Likewise, NAM partners with dozens of those state conventions. Again, they each maintain their autonomy and separate legal existence, and yet they partner together in joint ministry. Messengers, individuals from individual Southern Baptist churches, are appointed to attend the Southern Baptist Convention, where, with other members who all maintain their autonomy in their local churches, nonetheless vote together on convention business. Second data point. In the Supreme Court's decision in Watson v. Jones in 1871, the court made clear that, quote, voluntary religious associations, not merely churches, are entitled to freedom in their governance. And more recently, the Supreme Court affirmed that concept in both Hosanna Tabor and Our Lady of Guadalupe, where the court explained that religious autonomy extends not only to churches, but also to religious organizations of all sorts. And what the Watson court makes clear is that if you as an individual choose to, quote, unite, end quote, with a, quote, voluntary religious organization, association, end quote, you are deemed to have impliedly consented to that association's governance. And I think the passage from Watson is critical. The court said the right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine and for the ecclesiastical government of all the individual members, congregations, and officers within the association is unquestioned. All who unite themselves to such a body do so with an implied consent to this government and are bound to submit to it. But it would be a vain consent and would lead to a total subversion of such religious bodies if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. Pages 728 and 729 of Watson. That Watson decision is phrased as applying to voluntary religious associations of all sorts because the government cannot preference one religious organizational structure over another, particularly when that structure is of doctrinal significance and basis. But doesn't it depend on the claim? Don't you have to examine exactly what the claim is to see if you run into these principles? So the ecclesiastical abstention doctrine could turn on the specifics of the case, and I can talk about each of those claims here. So to take defamation, the claim of defamation is that Dr. McCraney was defamed when a claim was made that the SPA, the joint ministry document that defined the relationship between the two documents, that literally governed the relationship between the two organizations, was breached. You cannot decide whether someone was defamed with a statement that they breached a governance document without reaching a governance question. And that governance question, while my colleague, Mr. Gant, wants to say, well, it's just about whether he consulted appropriately, well, consulting appropriately is part of the cooperation. In fact, the paragraph 2 under general principles of the SPA says, the strategic partner agreement shall be driven by shared values that reflect mutual respect and peer-to-peer relationship. These values include biblical authority, kingdom advancement, partnership, evangelism and missions, mutual accountability, autonomy of individual Baptist entities. And so to decide whether someone consulted appropriately in the hiring of a minister, whether they breached in the way they consulted, has to look back at these questions that are driving, to use the word of the strategic partnership agreement, the cooperation. You cannot answer the question, did Dr. McCraney consult appropriately with NAM, without answering a governance question. You also can't answer it without answering a theological question. Dr. Warren testified that the document has to be interpreted and cannot be understood apart from an understanding of the Baptist faith and message 2000. The document itself makes that clear. Over and over it states what the purpose of the document is, what the purpose of the partnership, what the purpose of the, to use Watson's word, voluntary religious association is, namely to spread the gospel, to penetrate lostness, to advance the great commission. So you can't pull one clause out of it and say, well, that's the one you have to interpret, because as with any document, any clause in it has to be interpreted in light of the document as a whole. So it is fundamentally a governance question because it is a governance document, governing a voluntary religious association, and it would require theological determinations in order to interpret it. So that's defamation. Tortious interference, the argument is, the tortious interference was the defamation, was the statement that by NAM, the alleged statement by NAM to BCMD, that Dr. McCraney had breached the SPA. So the same analysis applies. To determine whether or not that conduct was tortious, you'd have to answer, was it false? If it's a true statement about him, there's no tortious interference. So it ultimately comes back on the same question. And likewise, the intentional infliction of emotional distress claim in Claims 1 through 3 again turns on, was their outrageous conduct a truth? Doesn't it depend, again, on the facts? For example, if consultation simply in the agreement was contemplated as I'm going to send you notice, give you 10 days to respond, and if you don't, I can hire this person. That turns on whether the notice was sent and whether there was a response. I mean, that to me could be argued without getting into any kind of ecclesiastical issues. It just doesn't depend on what's alleged. So I would say I actually disagree with that because I think it's a governance question. But even if that's the case as to just a simple provision like notice, when the whole premise of the way Baptists operate is through cooperative voluntary associations, a statement that someone breached the document by not interacting with one another appropriately, by not consulting appropriately, is necessarily a question about how Baptists should interact with one another. Well, if the agreement said we have to consult appropriately, that's probably correct. But if the agreement says you need to send me a written notice and I have X days to respond, if I don't respond, you're free to hire this person. I mean, it seems to me you could have a breach question of an agreement if we're talking about terms that don't require any kind of analysis of faith. But it may not require, but that's not the only test, respectfully. That's one of the tests is does it require a faith question. But the ecclesiastical abstention doctor is also required when the question is one of governance. And so courts, for example, have said when you have to interpret, this is the Oklahoma case we cite, when you have to look at an underlying church governing document that describes how the church operates, the Book of Order, I think it was. The court said we can't do that because answering that question would be interpreting a governance document. And that's the problem here is this document is governing the voluntary cooperative relationship between NAM and BCMD. And that governance question, regardless of whether it's a faith question, the governance question is beyond the bounds of the court. And that's why the ecclesiastical abstention doctrine, as this court articulated it in McCraney 1, had to ask does it raise governance questions, does it raise faith questions, does it raise doctrine questions. Any one of those would be sufficient to invoke the doctrine. We argue here that there are faith and doctrine questions under the Baptist faith and message. But even more fundamentally and easily, it's a governance question. How these two interact is the definition of a governance question. And so the governance prong of the ecclesiastical abstention doctrine, we believe, requires application of that. Can we talk a little bit about where this doctrine fits into the broader taxonomy of federal courts? So I noticed this morning you're using federal ecclesiastical autonomy abstention. You're calling it an abstention doctrine. There are lots of different phrases, ecclesiastical abstention, church autonomy, religious autonomy. I'm treating them all as of a piece getting at this idea that religious organizations govern themselves free from civil court interference. So it strikes me that at least when we go to operationalize this, we have to figure out a way to make it work consistent with what the Supreme Court has said and consistent with the way that federal rules work. So on one hand, Watson speaks in jurisdictional terms. That makes it sound like this is a 12B1, no different than saying the amount in controversy is below $75,000. Please dismiss. If that were true, then obviously the plaintiff could refile in state court. If it's just a question of federal jurisdiction, just like every other 12B1 defense that I can think of, there's another forum open to the dispute, and it could be some of those 12B1 things are waivable, some of them are not. I would actually say that's not quite true in this instance. So there's a doctrine called direct – it's a subset of collateral estoppel called direct estoppel, which says that even if it's not a decision on the merits in one court, if there's an issue decided, that issue is binding in the other court. And so I think it would be potentially sanctionable for this court to conclude, to rule that there is a prohibition from civil courts adjudicating this matter. Well, this is actually getting kind of at my concern, which is that this absolutely could be true, but what I meant was that 12B1 motions generally, right, 12B1 motions generally, if you win as the movement, then the plaintiff can refile somewhere else. It could look more like sovereign immunity or qualified immunity, right? So sovereign immunity makes some sense that the other courts and other judges across the country have said. Now it's kind of like qualified immunity. It could look like abstention, right? They don't adjudicate anything, right, as you know. I mean, if Pullman abstention, Younger abstention, Colorado River abstention, like those are nonadjudications. And so I guess my biggest question for you is how do you – what is your preference for the way that this fits, how it gets moved? I should also have said there's also the affirmative defense thing that comes from footnote 4 and Hosein and Tabor. How is it that you see this being operationalized, and what are the doctrinal consequences of succeeding or failing? So I have two concerns, to be honest. As someone who's representing a party in this particular case, what I would prefer is a ruling from this court that puts this to an end and doesn't send us back to state court. And I've explained why I think under either 28 U.S.C. 2111, the harmless air provision, or under a waiver theory or under a constitutional exception to 1477, that there could be a basis not to remand the jurisdictional question. I also have concern as somebody who just litigates religious liberty cases, which is that if you don't have it as a jurisdictional concept and it's merely an affirmative defense, it could be more difficult to raise it on a motion to dismiss, and you could force religious organizations through extended litigation that is itself intrusive into the religious operations. So I guess what I'm wondering is that if it were treated sort of like qualified immunity, does that not address everything you just listed? And by that, I mean you can move at the very beginning. You can say, you know, it's claim by claim, right? So that fixes some of the problems we've been talking about today. You say this is a I have an immunity from this claim. I get collateral order review if it's denied, right, just like you would in a QI case. It's an immunity from suit, right? So it prevents having this battle of experts about who penetrated lawlessness and who consulted in what way in the management document. Yes, and that is one of the – I do agree that if the court treated it as jurisdictional, that allows the parties to raise it right at the outset of the motion to dismiss stage. One of the other options I did think about this during preparation was that if it was like a qualified immunity and if this court gave direction to the district courts that when they hear cases of this type, that they should in the first instance resolve the question of ecclesiastical abstention and or ministerial exception and have discovery limited to those issues at the outset with an opportunity, essentially a bifurcated proceeding sort of like qualified immunity with the right of interlocutory appeal, that could ameliorate the concerns that were real here. We were cross-examining a minister over his understanding of the Bible. I mean, that's a – I was forced to do that because of the posture in the court sending us back down to do that, but I can't say that that's something that I prefer or would like to see as the standard going forward. I do think that there should be a mechanism to try to limit the intrusion. I mean, we have 1,200 pages of a record we submitted, internal minutes of meetings of religious bodies and their discussion, their prayer, their invocation of the Holy Spirit. I mean, all of those things work real harm to religious organizations that subject those to examination by the courts, but this court respectfully sent us back down to do that, and so we followed that directive. But I am concerned about that posture. I also want to respond, and I think this is important, this discussion about internal decision-making versus external decision-making. To answer internal, you have to say internal to what? What's the bounds by which you decide internal? There's individual churches as part of the BCMD, but once they form in the BCMD, decisions outside a church but inside the BCMD could be internal. All the state conventions are themselves religiously or autonomous, both doctrinally and legally, organizations, and yet they, in this instance, one of them, BCMD, joined into a partnership with NAM. So when you ask internal, you have to say internal to that partnership. And in fact, that's exactly what the court at the Fourth Circuit said in Bell versus Presbyterian Church. In that instance, 20-some different religious organizations, including the American Baptist Churches, including the Presbyterian Church USA, including the United Methodist Church, all partnered together and funded a separate entity called Interfaith Action. And the Fourth Circuit recognized that when you think about internal, it's not, well, internal to the United Methodist Church in that context. It's internal to the interfaith joining together, the interfaith partnership. And so the court rejected, on ecclesiastical abstention grounds, efforts by the director of Interfaith Action to bring suit against one of the supporting organizations, against the Presbyterian Church and the other churches. So even though it was separate legal entities, frankly separate faith traditions, the court recognized that internal in that context had to look at internal with regard to the Voluntary Religious Association, to use Watson's words, that was formed in that context. And here, what Mr. McCraney wants to do is say, look only at the Voluntary Religious Association of BCMD. And that's not the only Voluntary Religious Association on site here. There's also a Voluntary Religious Association between BCMD and NAM. And what Watson recognizes is it's not only within an individual, in that case congregation, but Watson references congregations who join together in an association. Here it's not congregations, but the religious entities that are joining together. And so when Mr. McCraney put so much emphasis on the fact that he was an employee of BCMD and not of NAM, legal employment status can't drive the application of these doctrines. In many denominations, in many faith traditions, the ministers aren't employees at all. They're lay elders. They're volunteer ministers who hold other secular jobs, but also hold offices in the church. And yet they're every bit as much ministers, regardless of whether they're employees of the organization. The question isn't driven by legal employment relationship. It's not driven by what's the legal bounds of the entity that was the person's employer. The question is what is internal, what is the Voluntary Religious Association that the dispute is internal to? And here the Voluntary Religious Association is between NAM and BCMD, and Mr. McCraney having chosen, to use Watson's words, to unite himself to that organization, is subject to its governance, unreviewable governance by this court. Thank you. Madam Chief Judge, how much time do I have left? Do I have my full five minutes? Thank you. Let's start off with Mr. Martin's first and last point about Watson and this notion of implied consent. I can hear the Baptist world jumping out of their seats at this. I direct you back to the Baptist leader, Amicus, brief on this point. As Professor Hankins pointed out, there's very little that ties Baptists together. The one substantive thing that they agree on emphatically is the principle of autonomy. Mr. Martin seems to be suggesting that somehow because BCMD and NAM agreed to do some work together, that that immunizes NAM from claims by Dr. McCraney on the notion, and he cites Watson for this notion of implied consent. The language in Watson says, all who unite themselves to such a body. What Watson was talking about with respect to implied consent was the reason why the court thought at that point in time that it should abstain or refrain from intervening in religious disputes. It said, okay, you have, and it's maybe borrowing ideas from Locke, you have decided to associate together in a group, and if you do that, you've impliedly consented to the disciplinary process or the governance of that body. Dr. McCraney never submitted himself in any respect to NAM. So NAM's reliance on the implied consent language and concept from Watson is entirely misplaced and an anathema to Baptist polity. With respect to McCraney one, NAM told the Supreme Court that it was erroneous and cited Bell, urging the Supreme Court to observe, believe that there was a circuit split. The Supreme Court denied certiorari without any dissents. But then and now, NAM cannot win under existing Fifth Circuit and Supreme Court law with respect to the arguments that it's advancing here. It wants you to adopt a legal framework that has no support in this court's jurisprudence or the Supreme Court's jurisprudence. They're running away from McCraney one, but it is the law of this circuit and well-reasoned. It is consistent with Supreme Court jurisprudence on the doctrine, whatever name you want to apply to it, religious autonomy, church autonomy. It is fully consistent with it, but NAM can't live with it because it doesn't allow them to do or escape in the way it wants to. Chief Judge Richman, you are absolutely right in asking Mr. Martins, don't we have to look at the claims, don't we have to look at the allegations? NAM wants to do a broad brush. They want to say, ah, there's a whiff of religion in the air. You cannot inquire. But that's not what the courts are supposed to do. They're supposed to use the Colorado River language, unflagging jurisdiction. To the extent that this is a jurisdictional exception or even a defense, it should be narrowly construed and done delicately just like it's done with respect to speech claims because the court, all the people of the country are entitled to constitutional protections. This is not a case where it's pro-religion versus anti-religion. We've explained in our brief, Dr. Hankins has explained, the Baptist leader brief has explained that there's pro-religion on both sides. NAM's view would do violence to the religious liberty of people like Dr. McCraney and other people who want to work in religious settings if you adopt NAM's view of the world, which is that you can have someone working for one organization, have tortious conduct by a different organization, and have the civil courts step aside and say, sorry, there's nothing we can do. We cannot apply neutral tort laws in order to adjudicate your claims. There can be scenarios where those tort claims could implicate purely and strictly ecclesiastical questions. I'm sure we can come up with both hypotheticals and probably clone the law books for real-world examples of it. But this isn't one, and we know it isn't one now based on a fully developed record. Mr. Martins says, oh, I spent time deposing Dr. McCraney about the Bible. Well, I sat through that deposition. I defended it. It was completely irrelevant, and we know it was irrelevant because not one iota of it that I can recall ended up in the summary judgment briefing. It was an exercise in intellectual stimulation by Mr. Martins, who has an advanced degree in, I think it's theology, but I apologize if I've gotten it wrong. Mr. Martins is very smart and very interested in these issues, but that examination had nothing to do with the case. If you look at the actual allegations, this is a case about garden-variety tortious conduct, and Dr. McCraney should be entitled to pursue his claims. But I encourage the court to look in detail at the actual claims and the actual allegations, including the citations to the record in our reply brief, and you'll see that there's no purely or strictly ecclesiastical question to decide at all, and certainly not with respect to all the causes of action. And finally, if I just may, I hope I haven't lost you yet, Judge Oldham, but certainly the best argument they have is that there's ecclesiastical issues with respect to Claim 1, the pre-termination tortious interference because of the SPA issue. I've given you an explanation about why that's wrong, but even if they're correct about that, you need to go claim by claim. Claims 4 through 6 are post-termination. They have nothing to do with the SPA or the BCMD. Unless the court has further questions, I thank you for your time and indulge me a few seconds extra. Thank you, counsel. Thank you.